UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
OCALA DIVISION

IRYNA CHECHEL,

      Petitioner,

-vs-                                          Case No. 5:10-cv-164-Oc-10GRJ

FRANTZ BRIGNOL,

      Respondent.
_____/

## **DISPOSITIVE ORDER**

      Iryna Chechel initiated this action against her former husband, Frantz Brignol, under the Hague Convention[1] (the "Convention") and the International Child Abduction Act ("ICARA"), 42 U.S.C. § 11601, et seq. Chechel seeks the entry of an order requiring the return of the parties' minor child to the Ukraine — the child presently being in the physical custody of her father, Brignol, in the United States and within the jurisdiction of this Court.

      There is no dispute that the Court has both subject matter jurisdiction of the action (see 42 U.S.C. § 11603) and in personam jurisdiction of the parties and the child.

---

[1] The Convention on The Civil Aspects of International Child Abduction, done at the Hague on October 25, 1980. T.I.A.S. No. 11670, S. Treaty Doc. No. 99-11. Text available at: http://www.hcch.net/index_en.php?act=conventions.text&cid=24

The petition was filed on April 22, 2010 (Doc. 1); a preliminary pretrial conference was held on May 17, 2010; and a final evidentiary hearing was conducted on June 7, 2010.[2]

## I. THE FACTS

1. The petitioner, Chechel, was born in the Ukraine in 1978, and is a citizen of that country where she presently resides. She has a university degree in finance and speaks three languages — Ukrainian, Russian and English. Her command of English is excellent. She reads, writes and speaks the language, and was able to testify with ease at the hearing without the aid of an interpreter.

2. The Respondent has a degree in dental medicine from the University of Florida and is a practicing dentist in Marion County, Florida, where he presently resides. He speaks English and some French, but does not speak Russian or Ukrainian. All communications between the parties (including numerous emails received in evidence) were conducted in English.

3. Chechel (living in the Ukraine) and Brignol (living in the United States) became acquainted in 2000 through an exchange of messages over the internet and, later, by letters transmitted through the mail.

4. Brignol traveled to Kiev, Ukraine, in 2001 and he and Chechel became acquainted in person. They agreed to marry, and to live in the United States, and they began planning Chechel's relocation.

---

[2] The case was expedited in accordance with the mandate of Article 11 of the Convention that "[t]he judicial...authorities of Contracting States shall act expeditiously in proceedings for the return of children."

5.     Brignol made all arrangements and paid all expenses for Chechel's move to the United States.

6.     Chechel came to the United States and arrived in Florida on October 8, 2002.

7.     Chechel and Brignol were married in Florida on October 21, 2002.

8.     At the time of the marriage, Brignol was a student at the University of Florida college of dentistry and the parties established their marital residence in Gainesville, Florida. Chechel became a housewife and did not work outside the home.

9.     A female child (E. B.) was born to the parties in Gainesville, Florida, on August 16, 2003. The child is a citizen of the United States and, according to Chechel, is also a citizen of the Ukraine.

10.    When Brignol graduated from dental school the parties moved to Ocala, Florida, where Brignol established a dental practice. Chechel continued to work in the home caring for E. B.

11.    The marriage was maintained, after the birth of E. B., for approximately two years until the middle of 2005.

12.    On July 22, 2005, using a prepared or preprinted form filled in by Brignol, the parties signed a document entitled "Marital Settlement Agreement For Dissolution Of Marriage, With Dependent Minor Children."[3] The agreement provided for dissolution of the marriage but did not provide for the division or distribution of any marital assets; did not provide for any spousal support or alimony; and did not provide

---

[3] See Petitioner's Exhibit 2 to Evidentiary Hearing.

for any child support payments.[4] The agreement did provide, however, by check marks inserted at the pertinent places on the form, that "parental responsibility for the minor child will be shared," and that "the primary residential parent will be [the] father."

13.   On the same date, July 22, 2005, and at the same time, Chechel also signed a preprinted form entitled "Answer, Waiver, And Request For Copy Of Final Judgment Of Dissolution Of Marriage."[5] The document admitted all of the allegations of the petition "filed in this action,"[6] consented to all relief requested in the petition (including child custody), and waived any notices as well as any appearance at the final hearing. The form did request that a copy of the final judgment be "forwarded to the Respondent at the address below," but the address given was the parties' marital address — that is, Brignol's address — in Ocala.

14.   On August 2, 2005, Brignol filed in the Circuit Court of the Fifth Judicial Circuit in and for Marion County, Florida, Case No. 05-3543 DR-FC, a preprinted form of Petition For Dissolution Of Marriage together with the Marital Settlement Agreement and the Answer and Waiver forms previously signed by Chechel.[7]

---

[4] Chechel testified, in effect, that she signed the agreement under duress — that her signing the document was the only way she could gain Brignol's consent to her return to the Ukraine with E. B. The Court expresses no opinion, and certainly makes no adjudication, concerning the validity or invalidity of the Marital Settlement Agreement or any of the state judicial proceedings that came afterward. As will be seen, however, the judgment of the state court, as a matter of law, is not dispositive of any of the issues in this proceeding.

[5] See Petitioner's Exhibit 3 to Evidentiary Hearing.

[6] No petition had been filed at that time. See paragraph 14, infra.

[7] See Petitioner's Exhibit 4 to Evidentiary Hearing.

4

15. On or about August 12, 2005, using one-way air fare tickets purchased by Brignol, Chechel and E. B. moved to the Ukraine. In order to facilitate the international travel by E. B. (four days removed from being two years old) Brignol gave a handwritten letter to Chechel dated August 12, 2005, stating:

> To whom it may concern:
>
> I am writing this letter to give permission to Iryna Chechel to travel with my daughter, E. B. Iryna Chechel is the mother of E. B. If you have any questions or concern, please call me at [etc.][8]

16. Although it is a matter of dispute, the Court finds that at the time of Chechel's return to the Ukraine with E. B. in mid August, 2005, and during the months that followed, it was the understanding of the parties that the relocation of E. B. from the United States to the Ukraine was to be for a prolonged but indefinite period of time — that she would ultimately be returned to the United States to complete her education but, in the meantime, would remain with her mother in the Ukraine.[9] In subsequent communications, for example, there was discussion and apparent agreement in

---

[8] See Respondent's Exhibit 9 to Evidentiary Hearing.

[9] While Brignol had in hand the signed Marital Settlement Agreement and had filed his Petition For Dissolution when Chechel and E. B. left for the Ukraine, all of his acts – or, in part, his inaction – suggest that he did not intend as of August 12, 2005, to enforce any claim he might have had to primary physical custody of E. B. at that time. Chechel and E. B. had traveled with one way tickets, and within less than a month after arriving in the Ukraine, Chechel informed Brignol by email (September 7, 2005) that she was enrolling E. B. in kindergarten and needed Brignol's financial assistance in purchasing a flat – assistance that he agreed to provide. Furthermore, and significantly, there is no record evidence that Brignol ever demanded E. B.'s permanent return to the United States until at least a year after her removal to the Ukraine. (See paragraphs 20 and 21, infra.)

December, 2006, that E. B. would return to live with her father in the United States when she became 8 or 9 years of age.[10]

17. On November 22, 2005, a final hearing was conducted on Brignol's Petition For Dissolution Of Marriage by a General Magistrate of the Circuit Court of Marion County, Florida. Brignol attended the hearing. Chechel, of course, was not given notice and did not attend. Brignol did not inform the General Magistrate that E. B., with Brignol's consent, had departed the United States with Chechel the previous August; and, significantly, Brignol did not seek at that time an order requiring the immediate return of E. B. to his custody.

18. On that same day, November 22, 2005, the General Magistrate filed a Report of Findings and Recommendations to the Circuit Court. The document included recommendations that the marriage be dissolved, that the husband (Brignol) be designated "as the primary physical residence parent of the child," and "[that] the parties shall share parental responsibility."[11]

19. On December 8, 2005, the Circuit Court of Marion County, Florida, entered a Final Judgment approving and confirming the Report and Recommendations of the General Magistrate dated November 22, 2005, as the judgment of the court. The Circuit Court also retained jurisdiction over the parties and the subject matter in order to enforce the judgment as necessary.[12]

---

[10]See Email from Brignol to Chechel, dated December 19, 2006 (Petitioner's Exhibit 24 to Evidentiary Hearing).

[11]See Petitioner's Exhibit 5 to Evidentiary Hearing.

[12]Id.

20. On October 27, 2006, over fourteen months after Chechel had left the United States with E. B., Brignol filed in the Circuit Court of Marion County, Florida, a Motion For Civil Contempt/Enforcement alleging that he had been designated as the parent having primary physical residence of E. B., and that Chechel "abducted the child and took her to a foreign country."[13]

21. On December 7, 2006, the General Magistrate of the Circuit Court conducted a hearing on Brignol's motion and filed a Report stating, inter alia, that:

> At the hearing today, the Former Husband testified that the Former Wife took the child to the Ukraine in December of 2005 for what he thought was a two week visit. Since that time the Former Wife has refused to return the child to the Former Husband.[14]

22. On January 2, 2007, the Circuit Court of Marion County, Florida, entered an Order approving and confirming the Report and Recommendation of the General Magistrate that a writ of bodily attachment be issued for Chechel subject to her right to purge the contempt "by returning the child to the former Husband in the State of Florida."

23. On January 17, 2007, as a result of an application previously made by Chechel, a Custody Commission of the Kozelshchyna District State Administration, Poltava Region, Ukraine, declared that "[t]he Custody Commission considers it

---

[13] See Exhibit P-12 to Deposition of Frantz Brignol, Dated May 24, 2010 (Doc. 23-3).

[14] See Exhibit P-13 to Deposition of Frantz Brignol (Doc. 23-3). It is undisputed, now, that Chechel and E. B. Left for the Ukraine on August 12, 2005, and there was no mention of a two week visit at the time.

expedient and obligatory that juvenile [E. B.] continue to reside with her mother Chechel Iryna Yuriivna."[15]

24. From August of 2005 until April 13, 2009, a period of over 3 ½ years, E. B. lived with Chechel or Chechel's family in the Ukraine. Except for a time in 2008, Brignol regularly sent money to Chechel for E. B.'s support; and, on at least four occasions, Brignol visited Chechel and E. B. in the Ukraine. E. B. was well nurtured, went to kindergarten and was otherwise cared for in a safe and secure family environment during her years in the Ukraine.

25. Throughout all of the time that E. B. remained in the Ukraine, Brignol never instituted any proceedings in that country seeking any right of custody with respect to E. B.[16]

26. On or about April 1, 2009, Chechel agreed to permit E. B. to travel to the United States with Brignol who provided the following sworn declaration:

> April 1, 2009
>
> To Whom It May Concern,

---

[15] See Petitioner's Exhibit 7 to Evidentiary Hearing. This document is worthy of consideration under Article 14 of the Convention which states that "the judicial...authorities of the requested State may take notice directly of... administrative decisions, formally recognized or not in the State of the habitual residence of the child, without recourse to the specific procedures for the... recognition of foreign decisions that would otherwise be applicable." See also 42 U.S.C. § 11605. The document also meets the authentication requirements of F.R.E. 901(b)(4) given its "distinctive characteristics, taken in conjunction with circumstances," and it is corroborated by the fact that the Ukrainian Ministry of Justice has presented to the Department of State a formal request for the return of E. B. to the Ukraine. (See paragraph 28, infra). In any event, the Ukrainian determination concerning custody, like the Florida state court judgment, is not dispositive of any of the issues in this case.

[16] The Ukraine became a party to the Convention as of September 1, 2007. (See http://www.hcch.net/index_en.php?act=status.accept&mid=974). (See also Petitioner's Exhibit 19 to Evidentiary Hearing).

> This is to acknowledge that I, Frantz Brignol, will take my daughter [E. B.] on vacation with me in the United States for 2 weeks. She is traveling with me on April 13, 2009, and will return back in Ukraine on April 26, 2009.
>
> Sincerely,
> (Sgd) Frantz Brignol[17]

27. On April 18, 2009, after E. B. had traveled to the United States with Brignol, he sent an email to Chechel stating that he did not intend to return E. B. to Chechel in the Ukraine, and he continues to retain physical custody of E. B. in the United States.[18]

28. On April 6, 2010, the Ministry of Justice of the Ukraine presented to the Department of State of the United States a formal request under the Convention for the return of E. B. to the Ukraine;[19] and, on April 22, 2010, Chechel filed the petition now before the Court (Doc. 1). A final evidentiary hearing has been held, both parties being present and represented by counsel, and the issues have been fully briefed. The case is ready for decision.

## II. THE LAW AND THE COURT'S DECISION

A. <u>The role of this Court and the effect of prior orders regarding E. B.'s custody</u>.

29. In a proceeding under the Convention and ICARA, this Court does not sit to decide child custody issues which are normally determined on the basis of the best

---

[17] See Exhibit P-15 to Deposition of Frantz Brignol (Doc. 23-3).

[18] See Respondent's Exhibit 7 to Evidentiary Hearing.

[19] See Petitioner's Exhibit 18 to Evidentiary Hearing.

9

interests of the child by courts or other official bodies having jurisdiction of domestic relations matters. As the Eleventh Circuit has observed, "[t]he court's inquiry is limited to the merits of the abduction claim and not the merits of the underlying custody battle. 42 U.S.C. § 11601(b)(4)." Ruiz vs. Tenorio, 392 F.3d 1247, 1250 (11th Cir. 2004). Indeed, Article 16 of the Convention expressly provides that "the judicial...authorities of the Contracting State to which the child has been removed or in which [the child] has been retained shall not decide on the merits of rights of custody until it has been determined that the child is not to be returned under this Convention. . . ."[20] This concept is reiterated in Article 19 of the Convention, stating that "[a] decision under this Convention concerning the return of the child shall not be taken to be a determination on the merits of any custody issue."

30. In essence, therefore, the limited function of this Court under the Convention and ICARA is to act as a gatekeeper and decide which forum should have the authority to determine the ultimate issue of the child's custody — the courts of the jurisdiction in which the child is presently retained, or the courts of the jurisdiction from which the child was removed. And in making that choice, Article 17 of the Convention precludes determinative reliance upon or conclusive application of any prior order or decree in the requested State relating to the custody of the child. Specifically, Article 17 provides:

---

[20]Article 13(b) of the Convention provides an exception, not applicable in this case, that the court is not bound to order the return of a child if "there is a grave risk that his or her return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation."

> The sole fact that a decision relating to custody has been given in or is entitled to recognition in the requested State shall not be a ground for refusing to return a child under this Convention, but the judicial or administrative authorities of the requested State may take account of the reasons for that decision in applying this Convention.

31. This effectively means that, in deciding cases under the Convention and ICARA, not only does the Court lack authority to resolve issues relating to custody, any prior orders or decrees of other courts or official bodies awarding custody are "irrelevant" to the issue of the habitual residence of the child.[21] Kijowska vs. Haines, 463 F.3d 583, 588 (7th Cir. 2006); Yang vs. Tsui, 416 F.3d 199, 201 (3rd Cir. 2005); Silverman vs. Silverman, 338 F.3d 886, 895 (8th Cir.2003); Miller vs. Miller, 240 F.3d 392, 399 (4th Cir. 2001).

B. The guiding principles of the Convention.

32. The stated object of the Convention, as expressed in Article 1(a), is "to secure the prompt return of children wrongfully removed to or retained in any Contracting State. . . ."

33. Under Article 3 of the Convention, the removal or retention of a child is considered wrongful where "(a) it is in breach of rights of custody. . . under the law of the State in which the child was habitually resident immediately before the removal or retention; and (b) at the time of removal or retention those rights were actually exercised, either jointly or alone, . . . . "

---

[21] While orders affecting custody rights are not germane to the issue of "habitual residence," such orders are important to the standing of a Petitioner under Article 3 of the Convention. See paragraph 33, infra.

11

34. It follows that the core, threshold decision required by Article 3 in all cases brought under the Convention and ICARA is to determine the child's "habitual residence" at the time of the alleged wrongful removal or retention.[22] If the child was not an "habitual resident" of the State from which she was removed, then, obviously, she need not — indeed, cannot — be returned there. Conversely, in this case, if the child was an "habitual resident" of the Ukraine at the time of her retention by Brignol, she must be returned to the Ukraine for a determination of her custody by the appropriate authorities in that forum.

35. Despite the central importance of the term "habitual residence" in cases brought under the Convention, those words are not defined in the Convention or by ICARA. The cases uniformly hold, however, that the term is not synonymous with "domicile" which in law refers to the place a person considers to be his or her permanent home. Kjowska, 463 F.3d at 586-587 (citing Friedrich vs. Friedrich, 983 F.2d 1396, 1401 (6th Cir. 1993)). It follows that an "habitual residence" can be established by an intent to remain in a given location for an indefinite period of time, and the relevant intent is that of the person or persons entitled to fix the place of the child's residence. Mozes vs. Mozes, 239 F.3d 1067 (9th Cir. 2001), approved by the Eleventh Circuit in Ruiz, 392 F.3d 1247.

---

[22] The other preliminary requirements of Article 3 have been met in this case. Chechel has proved by a preponderance of the evidence that she had custody of E. B. under the law of the Ukraine at the time of E. B.'s removal and subsequent retention, and that she was exercising those rights. (See paragraph 23, supra). See also Petitioner's Exhibit 20 to Evidentiary Hearing.

C. The initial removal of E. B. to the Ukraine.

36. Here, nobody disputes that E. B. began her life in, and became an "habitual resident" of, the United States. It was the settled intent of her parents, until the time she became almost two years old, that the family would reside, and E. B. would be raised and educated, in the United States.

37. A question arises, therefore, as to whether the removal of E. B. to the Ukraine by Chechel in August, 2005, was itself an unlawful removal and retention that would prevent the establishment of a new "habitual residence" there. A number of cases have held that a wrongful removal of a child cannot form the basis of a new "habitual residence." See Kijowska, 463 F.3d at 587 (citing Diorinou vs. Mazitis, 237 F.3d 133,142 (2nd Cir. 2001)); Miller, 240 F.3d at 400; and Friedrich, 983 F.3d at 1402.

38. The key question here is whether the move was "wrongful," and is to be distinguished from the closely related issue of whether there was an intent to abandon the United States and embrace the Ukraine as E. B.'s new habitual residence.

39. The Court has no hesitancy in concluding that there was nothing wrongful in Chechel's removal of E. B. to the Ukraine in August of 2005. Despite the terms of the Marital Settlement Agreement Chechel had signed on July 22, designating Brignol as the "primary residential parent," he clearly waived any rights he might have had under that Agreement when he gave his written consent to the travel (paragraph 15, supra), purchased one way air fare tickets, and thereafter acquiesced in E. B.'s presence there for an indefinite period of time.

D. <u>The establishment of E. B.'s habitual residence in the Ukraine</u>.

40. As stated by the Eleventh Circuit in <u>Ruiz</u>:

> The first step toward acquiring a new habitual residence is forming a settled intention to abandon the one left behind. It is not necessary to have this settled intention at the time of departure, as it could develop during the course of a stay originally intended to be temporary. Whether there is a settled intention to abandon a prior habitual residence is a question of fact . . . .

392 F.3d at 1252 (internal citations and quotations omitted).

41. In <u>Mozes vs. Mozes</u>, <u>supra</u>, the Ninth Circuit noted three categories of cases in which there is disagreement between the parties about the place of a child's habitual residence. This case falls within category three of the <u>Mozes</u> paradigm, expressly approved by the Eleventh Circuit in <u>Ruiz</u>, consisting of cases in which the parents had agreed to the relocation of the child for some period of ambiguous duration. With respect to those cases, the <u>Mozes</u> court said, and the <u>Ruiz</u> court reiterated:

> Sometimes the circumstances surrounding the child's stay are such that, despite the lack of perfect consensus, the court finds the parents to have shared a settled mutual intent that the stay last indefinitely. When this is the case, we can reasonably infer a mutual abandonment of the child's prior habitual residence.

<u>Mozes</u>, 239 F.3d at 1077; <u>Ruiz</u>, 392 F.3d at 1253.

42. So it is in this case that the Court infers from the facts, and concludes as a matter of law, that the parties, in August, 2005, and in the months that followed, formed a shared intent to abandon the United States as E. B's place of habitual

14

residence and to establish instead her habitual residence in the Ukraine for a prolonged and indefinite period of time at which point she would return to the United States to complete her education. This fluid understanding was refined and clarified to some extent in December, 2006, when the parties agreed that E. B. would return to her father when she became 8 or 9 years of age.[23] From this it follows that in April, 2010, when Brignol retained E. B. in the United States, her habitual residence was in the Ukraine and the retention was wrongful.

E.   Brignol's claim that E. B. has become "settled" in the United States.

    43.   Article 12 of the Convention provides:

> Where a child has been wrongfully removed or retained in terms of Article 3 and, at the date of the commencement of the proceedings before the judicial or administrative authority of the Contracting State where the child is, a period of less than one year has elapsed from the date of the wrongful removal or retention, the authority concerned shall order the return of the child forthwith.
>
> The judicial or administrative authority, even where the proceedings have been commenced after the expiration of the period of one year referred to in the preceding paragraph, shall also order the return of the child, unless it is demonstrated that the child is now settled in its new environment.

    44.   Brignol claims that he should be entitled to show as a defense that E. B. has become "settled" in the United States, and not subject to return to the Ukraine, because the petition was filed more that one year after her wrongful removal. His

---

[23] Obviously, at some point in time during E. B.'s three and a half year stay in the Ukraine, Brignol changed his mind about her continued presence there, but whenever that occurred, it was ineffectual; E. B.'s habitual residence in the Ukraine was established.

argument is that the wrongful removal, assuming one occurred, happened on April 18, 2009, when he notified Chechel by email (see paragraph 27, supra) that he did not intend to return E. B. on April 26, 2009, as he had previously agreed (see paragraph 26, supra); and, since the petition was filed in this action on April 22, 2010, more than one year had elapsed from the time of the wrongful removal. On the other hand, if the wrongful retention did not occur until April 26, 2010, when E. B. was not returned as agreed, then the petition was filed before the expiration of the one year period and the settlement defense is unavailable.

45. Brignol relies upon Zuker vs. Andrew, 2 F. Supp. 2d 134 (D. Mass. 1998) for the proposition that the giving of notice of intent not to return a child to its habitual residence is the date of the commencement of a wrongful retention; and that would seem to be good law in those situations like Zuker in which there is no prior agreement concerning the date or time the child would be returned. Where there is an agreement, however, as in this case, courts have uniformly held that the wrongful retention begins when the agreed date passes, not when the earlier notice of intent is given. See Philippopoulus vs. Philippopoulus, 461 F. Supp. 2d 1321 (N. D. Ga. 2006); In re Ahumada, 323 F. Supp. 2d 1303 (S. D. Fla. 2004); Falk vs. Sinclair, Civil No. 09-346-P-S, 2010 WL 723744 (D. Me. March 19, 2010).

46. The Court concludes that the defense of settlement of the child under Article 12 of the Convention is unavailable to Brignol in this case.

## III. CONCLUSION

The Petition for the return of E. B. to the Ukraine pursuant to the requirements of the Convention and ICARA (Doc. 1) is GRANTED. The Marshal, upon the request of the Petitioner or her counsel of record, shall give all necessary assistance to achieve the prompt and safe delivery of the child E. B. to the Petitioner or her counsel for return to the Ukraine; and the Respondent is ordered and directed to deliver to the Petitioner E. B.'s passport, her other belongings reasonably necessary to her travel, and to take such other steps as may reasonably be necessary to effectuate the terms of this order.

The Clerk is directed to forthwith enter judgment in accordance with this order.

Done and Ordered at Ocala, Florida, this 21st day of June, 2010.

*[signature]*

UNITED STATES DISTRICT JUDGE

Copies To: Maurya A. McSheehy
United States Marshal